UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALETA LILLY, et al.,<br>        Plaintiffs,<br>    v.<br>JAMBA JUICE COMPANY, et al.,<br>        Defendants. | Case No. 13-cv-02998-JST<br><br>**ORDER GRANTING PRELIMINARY APPROVAL**<br>Re: ECF No. 60 |

In this class action, Plaintiffs allege that Defendants labeled their smoothie kits "all natural," when in fact the kits contained ingredients that consumers would not have understood to be "natural." ECF No. 1. On September 18, 2014, the Court certified a class of "all persons in California who bought one of the following Jamba Juice Smoothie Kit products: Mango-a-go-go, Strawberries Wild, Caribbean Passion, Orange Dream Machine, and Razzmatazz" for purposes of determining liability. ECF No. 54. The Court did not resolve the question of whether putative class plaintiffs Aleta Lilly and David Cox had standing to seek injunctive relief under Federal Rule 23(b)(2), an issue as to which the Court invited further briefing. ECF No. 50. Before the Court could rule on that question, however, the parties informed the Court at a case management conference that they had settled the case in principle, see ECF No. 57, and subsequently filed a motion for preliminary approval of a class action settlement for injunctive relief. ECF No. 60.

The Court now considers the motion for preliminary approval of the class action settlement. Because the parties seek to resolve the action by stipulating to injunctive relief, the Court first answers the question of whether the class has standing to seek injunctive relief. Because the Court concludes that plaintiff has standing to seek such relief, the Court then turns to the merits of the proposed settlement, and grants the motion for preliminary approval.

## I. BACKGROUND

### A. Factual History

As recounted in this Court's prior class certification order, ECF No. 54, Defendants Jamba Juice Company and Inventure Foods, Inc. ("Defendants") have since 2010 produced at-home frozen smoothie kits for sale in retail grocery stores, big box stores, and wholesale clubs throughout California. Class Action Complaint ("Compl.") ¶¶ 2-3 (ECF No. 1-1). The Smoothie Kits, which come in five flavors, are sold in a three-sided pouch with the words "All Natural" appearing prominently on the front of the package. Compl. ¶ 3; see also, Exh. 1 to Declaration of Rosemary M. Rivas. Plaintiffs allege that the Smoothie Kits contain ascorbic acid, xanthan gum, steviol glycosides, modified corn starch, and gelatin (the "challenged ingredients").

Plaintiff Aleta Lilly purchased the "Strawberries Wild" and "Caribbean Passion" smoothie kits from March 2010 to November 2012. Compl. ¶ 12. Plaintiff David Cox purchased the "Caribbean Passion" smoothie kits "within the last three years." Compl. ¶ 13. Plaintiffs allege that, in making their purchases, they relied on the representation that the smoothie kits are "all natural," and they believe that because the Smoothie Kits contain the challenged ingredients, the kits are not "all natural." Compl. ¶¶ 12-13.

Plaintiff Lilly says that, although she has not purchased any Jamba Juice smoothie kits since she filed the lawsuit challenging the alleged mislabeling, she "would consider purchasing the products again if the products were honestly labeled" and she "could make an informed decision." Supplemental Declaration of Aetna Lilly, ECF No. 52-1, ¶ 3 ("Lilly Supp. Decl.").

### B. Procedural History

Plaintiffs Lilly and Cox filed a proposed class action complaint in this action in June 2013. The complaint brings causes of action under the California Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750 *et seq.*, the California False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500 *et seq.*, the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 *et seq.*, and for breach of warranty pursuant to Cal. Comm. Code § 2313. ¶¶ 42-70. In November, the Court denied Defendants' motion to dismiss. 2013 WL 6070503 (N.D. Cal. Nov. 18, 2013).

The Plaintiffs moved to certify a class for the purposes of liability and damages. ECF No. 29. Due to questions about whether damages could "feasibly and efficiently be calculated," <u>Leyva v. Medline Indus. Inc.</u>, 716 F.3d 510, 514 (9th Cir. 2013), the Court declined to certify a damages class, but certified a class for the purpose of determining liability. ECF No. 54. On August 21, 2014, at the hearing on that motion, the Court requested supplemental briefing on the 23(b)(2) issue of certification for injunctive relief, which had been pleaded in the complaint but not otherwise briefed. ECF No. 29 at n.1. The parties submitted such briefing and Defendant disputed that certification for injunctive relief was appropriate. ECF No. 52, 53, 55. Nonetheless, the parties subsequently participated in an "in-person, half-day mediation" on October 15, 2014, during which they reached the material terms of the settlement currently before the Court, which includes injunctive relief. ECF No. 60.

## II.     JURISDICTION AND CLASS CERTIFICATION

The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) & (6), the Class Action Fairness Act of 2005 ("CAFA").

"The claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval." Fed. R. Civ. Pro. 23(e).   While no party currently disputes Plaintiffs' the propriety of certifying an injunctive class for settlement purposes under 23(b)(2), "federal courts are required sua sponte to examine jurisdictional issues such as standing." <u>B.C. v. Plumas Unified School Dist.</u>, 192 F.3d 1260, 1264 (9th Cir. 1999).[1] The parties have now agreed to a settlement which would provide Plaintiffs with injunctive relief, but Defendant previously argued that plaintiffs lacked standing to seek such relief. Standing is part of "the threshold requirement imposed by Article III of the Constitution" requiring plaintiffs to allege an "actual case or controversy." <u>City of Los Angeles v. Lyons</u>, 461 U.S. 95, 101 (1983). Therefore, the Court must satisfy itself that it has jurisdiction over Plaintiffs' claims for injunctive

---

[1] The Court's prior order certifying the class for the purposes of liability determined that the prerequisites for certifying a class under 23(a)(1) were satisfied. Therefore, the question of whether the class may be certified for settlement purposes under 23(b)(2) depends on whether plaintiff has standing to seek injunctive relief. See ECF No. 54 at 3, n. 1.

relief before reaching the merits question of whether to preliminary approve the proposed settlement, which would provide the class with injunctive relief.

### A. Legal Standard

"To have standing to obtain injunctive relief, a plaintiff must allege that a 'real or immediate threat' exists that he will be wronged again." Rahman v. Mott's LLP, CV 13-3482 SI, 2014 WL 325241 at *10 (N.D. Cal. Jan. 29, 2014) (quoting Lyons, 461 U.S. at 111)). "In a class action, '[u]nless the named plaintiffs are themselves entitled to seek injunctive relief, they may not represent a class seeking that relief.'" Garrison v. Whole Foods Mkt. Grp., Inc., 13-CV-05222-VC, 2014 WL 2451290 at *5 (N.D. Cal. June 2, 2014) (quoting Hodgers–Durgin v. de la Vina, 199 F.3d 1037, 1045 (9th Cir.1999)).

### B. Analysis

Courts in this District have grappled with the question of when a consumer class may be certified for the purposes of obtaining injunctive relief against deceptive product labeling under Rule 23(b)(2). Some courts have held that once a consumer is aware that a label is misleading, she can never have standing to seek injunctive relief, because there is no danger that she will be misled in the future. E.g., Ham v. Hain Celestial Grp., Inc., No. 14-CV-02044-WHO, 2014 WL 4965959, at *6 (N.D. Cal. Oct. 3, 2014). Other courts have found that such a consumer has standing, as long as she expresses the "intent to purchase [the challenged products] in the future." Ries v. Arizona Beverages USA LLC, 287 F.R.D. 523, 533-34 (N.D. Cal. 2012), appeal dismissed (Jan. 25, 2013); Jones v. ConAgra Foods, Inc., No. 12-CV-01633 CRB, 2014 WL 2702726 at *12 (N.D. Cal. June 13, 2014) at *12 (citing cases).

This Court must therefore answer the question of whether a plaintiff can ever have standing to seek an injunction against a product she knows to be mislabeled. This Court agrees with those decisions that have answered this question in the affirmative. To hold otherwise would effectively preclude consumers from ever obtaining prospective relief against mislabeling. As other courts have already recognized,

> If the Court were to construe Article III standing for FAL and UCL claims as narrowly as the Defendant advocates, federal courts would be precluded from

enjoining false advertising under California consumer protection laws because a plaintiff who had been injured would always be deemed to avoid the cause of the injury thereafter ("once bitten, twice shy") and would never have Article III standing.

Henderson v. Gruma Corp., 2011 U.S. Dist. LEXIS 41077 at *19-20 (C.D. Cal. Apr. 11, 2011); see also Koehler v. Litehouse, Inc., 2012 WL 6217635, at *16-17 (N.D. Cal. Dec. 13, 2012) (to deny injunctive relief "would eviscerate the intent of the California Legislature in creating consumer protection statutes because it would effectively bar any consumer who avoids the offending product from seeking injunctive relief"); Ries, 287 F.R.D. at 533 ("were the Court to accept the suggestion that plaintiffs' mere recognition of the alleged deception operates to defeat standing for an injunction, then injunctive relief would never be available in false advertising cases, a wholly unrealistic result"); Cabral v. Supple, LLC, 2012 WL 4343867, at *5-6 (C.D. Cal. Sept. 19, 2012) (also following Henderson); Larsen v. Trader Joe's Co., 2012 WL 5458396, at *11 (N.D. Cal. June 14, 2012) ("Construing Article III standing as narrowly as defendant suggests in consumer protection statutes . . . would effectively bar any consumer who avoids the offending product from injunctive relief.").

The Court is not persuaded by those courts that have reached the contrary conclusion that injunctive relief is not available for a consumer who is aware of the misrepresentation. E.g., Garrison v. Whole Foods Mkt. Grp., Inc., No. 13-CV-05222-VC, 2014 WL 2451290, at *5 (N.D. Cal. June 2, 2014) ("The named plaintiffs in this case allege that had they known the Whole Foods products they purchased contained SAPP, they would not have purchased them . . . . Now they know. There is therefore no danger that they will be misled in the future."); Ham, 2014 WL 4965959 at *5 ("Consumers who were misled by deceptive food labels lack standing for injunctive relief because there is no danger that they will be misled in the future.'" (citations omitted)). These holdings misapprehend the nature of the injury suffered by the consumer. When a consumer discovers that a representation about a product is false, she doesn't know that another, later representation by the same manufacturer is also false. She just doesn't know whether or not it's true. A material representation injures the consumer not only when it is untrue, but also when it is *unclear* whether or not is true.

5

Basic economics also supports the notion that the past-purchaser plaintiff will suffer a potential injury in the absence of an injunction. In fact, because this consumer has already voted with her wallet, we know that she is the *most* likely to be injured in the absence of an injunction, not the least.

Consumers make choices in the marketplace among the alternative goods competing for their dollars. "In explaining consumer behavior, economics relies on the fundamental premise that people choose those goods and services they value most highly." Paul A. Samuelson & William D. Nordhaus, Economics 84 (19th ed. 2010). Economists "assume that each consumer maximizes utility, which means that the consumer chooses the most preferred bundle of goods from what is available." Id. at 87. "Utility" in this context simply means "satisfaction," and is a way of rank-ordering different goods and services. Id. at 84. So, when a consumer buys a certain consumer good, we may safely assume that she chose that item because it contained that bundle of characteristics most likely to provide the greatest utility. Id. ("In the theory of demand, we assume that people maximize their utility, which means that they choose the bundle of consumption that they most prefer."); see also Robert S. Pindyk & Daniel L. Rubinfeld, Microeconomics 73 (3rd ed. 1995) (we know that consumers will "choose goods to maximize the satisfaction they can achieve, given the limited budget available to them.")

This state of affairs follows naturally from the limited resources available to most consumers. Because of those limits, every purchase has an opportunity cost; a dollar spent on coffee, for example, cannot be spent on orange juice.[2] Therefore, the consumer chooses those goods most likely to provide satisfaction to her. Pindyk & Rubinfeld at 73. In part because of this condition of consumer behavior, we know which goods consumers prefer among the choices

---

[2] Remember that one of the cardinal tenets of economics is that resources are scarce. That means every time we choose to use a resource one way, we've given up the opportunity to utilize it another way . . . . [¶] In each of these cases, making a choice in effect costs us the opportunity to do something else. The value of the best alternative forgone is called the opportunity cost[.]

Samuelson at 139.

6

available to them – because those are the goods they purchase. Id. at 81.

Turning to the consumer who buys a mislabeled product that promises an attribute that the product does not in fact deliver, we know that she values most highly the product as it was promised to be – because that's how she spent her money. It is correct that now that she is aware of the misrepresentation, she knows that the product she bought was not as advertised. But the manufacturer may change or reconstitute its product in the future to conform to the representations on the label. In fact, the manufacturer has every reason to do this, since the market apparently values the very attribute the label promises. In that event, the product would actually become the product that our hypothetical consumer values most highly, and it would be labeled as such. But unless the manufacturer or seller has been enjoined from making the same misrepresentation, our hypothetical consumer won't know whether the label is accurate. And she won't know whether it makes sense to spend her money on the product, since she will suspect a continuing misrepresentation. In fact, knowing about the previous misrepresentation, she probably *won't* buy it – *even though it is now precisely the product she wants above all others*. So, while other consumers may purchase the (now correctly labeled) product, our consumer – the person most likely to suffer future injury from this misrepresentation – will be deprived of it.[3] A rule that prevents this consumer from seeking an injunction doesn't comport with traditional notions of standing; it prevents the person most likely to be injured in the future from seeking redress.

For these reasons, this Court holds that a consumer is not disabled from seeking injunctive relief against false labeling solely because she learns, after purchasing a product, that the label is false.

Defendants also previously disputed whether Lilly's declaration of future intent to purchase the product was sufficient to confer standing. Defendants argued that she has failed to allege a sufficient future interest in purchasing the challenged smoothie kits, as she has stated only

---

[3] See Ries, 287 F.R.D. at 533 ("Should plaintiffs encounter the denomination 'All Natural' on an AriZona beverage at the grocery store today, they could not rely on that representation with any confidence. This is the harm California's consumer protection statutes are designed to redress.").

that she "would *consider* purchasing the products again if the products were honestly labeled." Lilly Supp. Decl. at ¶ 3 (emphasis added). Defendants contended that Lilly had no "real and immediate threat of future injury" because she did not claim a definite intent to purchase the challenged products in the future. ECF No. 53 at 6:13-15.

While the contours of what a plaintiff must claim about a future interest in a product in order to have standing to represent a 23(b)(2) class have not been defined with precision,[4] the Court concludes that a willingness to consider a future purchase is sufficient. The harms Plaintiffs seek to avoid by bringing this litigation are not just the harms related to purchasing or consuming a mislabeled product, but also the harm of being a consumer in the marketplace who cannot rely on the representations made by Defendants on their product labels. See Ries, 287 F.R.D. at 533. Without injunctive relief, Lilly could never rely with confidence on product labeling when considering whether to purchase Defendants' product.

A standard that would require plaintiffs to state a definite intent to purchase a certain product at an unknown date in the future is inconsistent with the realities of consumer purchase decisions. Consumers make decisions in a dynamic marketplace, based on all the information available to them at the time of purchase, including the other similar products then available and all other potential uses of the funds available to make the purchase at issue. A plaintiff cannot know today what the competing uses for her money will be at an unknown date in the future. Perhaps someone will create a product that is more desirable than the defendant's; perhaps the plaintiff's tastes will change. Nonetheless, injunctive relief enables the Plaintiffs and other consumers to have confidence that the information they receive about the challenged products at the time of purchase is accurate. Defendants' alleged mislabeling harms consumers by providing them with misleading information and depriving them of their ability to make an informed

---

[4] Compare Jones, 2014 WL 2702726 at *13 (indicating that standing would have existed if plaintiff had testified "that he bought the Hunt's products in reliance on the label because he seeks out natural products, but that he *might* purchase Hunt's products in the future if they were properly labeled" (emphasis added)) with Rahman, 2014 WL 325241 at *10 (concluding that "to establish standing, plaintiff must allege that he *intends* to purchase the product at issue in the future" (emphasis added)).

8

decision about how to best spend their money.

Lilly's statement that she would consider spending her money to purchase Defendants' products if they were labeled correctly in the future therefore gives Plaintiffs standing to seek injunctive relief.

### III. PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT

#### A. Settlement Terms

As summarized by Plaintiffs, the terms of the stipulated injunction are as follows:

1. Defendants shall effect relabeling of all Challenged Products so that they do not describe the products as "all natural" on packaging or other advertising.

2. Defendants shall effect relabeling of all Challenged Products on its website pages so that they do not describe the Challenged Products as "all natural."

3. Defendants shall effectuate the changes set forth above by March 31, 2015 and provide Plaintiffs with a declaration setting forth compliance with the above obligations and shall maintain records necessary to demonstrate compliance with the same.

4. Defendants are not required to remove or recall any of the Challenged Products in market, inventory, or elsewhere; nor are Defendants required to discontinue the use of, or destroy, any packaging inventory that was in existence prior to final judicial approval of this agreement. Instead, Defendants shall not print any Challenged Product labels after March 31, 2015 that do not comply with Paragraph 4(A) above. However, Defendants may, now or after March 31, 2015, exhaust all existing packaging inventory and thereafter sell and distribute Challenged products bearing labeling printed on or before the final approval date of this agreement, without violating the terms of this agreement.

5. Plaintiffs and all members of the Settlement Class shall be forever enjoined from filing any action seeking injunctive relief pursuant to Rule 23(b)(2) for as long as the Stipulated Injunction remains in effect, against Defendants prohibiting them from labeling the Challenged Products containing the Challenged Ingredients as "all natural". Settlement Agreement ¶ 4.F.

ECF No. 60 at 4.

#### B. Legal Standard

The Ninth Circuit maintains a "strong judicial policy" that favors the settlement of class actions. Class Plaintiffs v. City of Seattle, 955 F.2d 1268, 1276 (9th Cir. 1992). Courts generally employ a two-step process in evaluating a class action settlement. First, courts make a

9

"preliminary determination" concerning the merits of the settlement and, if the class action has settled prior to class certification, the propriety of certifying the class. See Manual for Complex Litigation, Fourth ("MCL, 4th") § 21.632 (FJC 2004). "The initial decision to approve or reject a settlement proposal is committed to the sound discretion of the trial judge." Class Plaintiffs v. City of Seattle, 955 F.2d at 1276. Where the parties reach a class action settlement prior to class certification, courts apply "a higher standard of fairness and a more probing inquiry than may normally be required under Rule 23(e)." Dennis v. Kellogg Co., 697 F.3d 858, 864 (9th Cir. 2012) (citation and internal quotation marks omitted). Courts "must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." In re Bluetooth Headset Prods. Liab. Litig., 654 F.3d 935, 947 (9th Cir. 2011).

The Court's task at the preliminary approval stage is to determine whether the settlement falls "'within the range of possible approval.'" In re Tableware Antitrust Litig., 484 F. Supp. 2d 1078, 1080 (N.D. Cal. 2007) (quoting Schwartz v. Dallas Cowboys Football Club, Ltd., 157 F. Supp. 2d 561, 570 (E.D. Pa. 2001)). See also MCL, 4th § 21.632. (courts "must make a preliminary determination on the fairness, reasonableness, and adequacy of the settlement terms and must direct the preparation of notice of the certification, proposed settlement, and date of the final fairness hearing."). After preliminary approval, courts must hold a hearing pursuant to Federal Rule of Civil Procedure 23(e)(2) to make a final determination of whether the settlement is "fair, reasonable, and adequate." Here, Plaintiff asks the Court to take the first step in granting preliminary approval to the proposed settlement.

Preliminary approval of a settlement is appropriate if "'the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls within the range of possible approval.'" In re Tableware, 484 F. Supp. 2d at 1079 (quoting Manual for Complex Litigation, Second § 30.44 (FJC 1985)). The proposed settlement need not be ideal, but it must be fair and free of collusion, consistent with a plaintiff's fiduciary obligations to the class. Hanlon, 150 F.3d at 1027) ("Settlement is the offspring of compromise; the question

10

we address is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion."). To assess a settlement proposal, courts must balance a number of factors:

> the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the state of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.

Hanlon, 150 F.3d at 1026 (citations omitted). The proposed settlement must be "taken as a whole, rather than the individual component parts" in the examination for overall fairness. Id. Courts do not have the ability to "delete, modify, or substitute certain provisions" because the settlement "must stand or fall in its entirety." Id.

**C.  Analysis**

First, the Court finds that the proposed Settlement is procedurally fair. The settlement appears to be "the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls within the range of possible approval." In re Tableware, 484 F. Supp. 2d at 1079.

Nothing suggests the settlement was collusive. The parties previously disputed the Plaintiff's standing to seek injunctive relief, as well as the propriety of class certification for determining liability and damages. Following the Court's issuance of the initial certification order certifying the class for the purposes of determining liability only, ECF No. 54, the parties both had significantly more information about the strength of their positions. It was after the issuance of this order that the parties participated in an in-person, half-day mediation before a professional mediator and ultimately reached this settlement.

Turning to a consideration of the substantive fairness of the settlement, the Court notes that its certification order indicated that Plaintiffs faced substantial obstacles to obtaining classwide monetary relief. The Court's certification order indicated that Plaintiffs' had sufficiently

demonstrated that the class was numerous, ascertainable, that the class representative satisfied the adequacy and typicality requirement, and that a class action was superior to other means for adjudicating the controversy. The Court concluded, however, that Plaintiffs had not shown that common questions predominated for the purposes of determining damages, as Plaintiffs had failed to present a damages model. See id. at 14-19. Although the Court concluded it could not certify the class for the purposes of ascertaining damages, the Court exercised its discretion to certify the class solely for determining the issue of liability under 23(c)(4).

In light of the difficulty Plaintiffs would face establishing damages on a classwide basis[5] and the relatively small amount of money individual class members would be entitled to, the risk, expense, complexity, and likely duration of further litigation also support the conclusion that the settlement is substantively fair. In order to achieve this outcome in the absence of the settlement, Plaintiffs would first need to to succeed in establishing liability--which Defendant still contests--at trial. This would take a considerable amount of time and expense and Plaintiffs would not be certain to succeed.

Even if Plaintiffs' were to succeed in establishing liability and the Court were to grant injunctive relief, Plaintiffs would face further difficulty in obtaining monetary compensation for class members given the Court's previous order declining to certify a class for the purposes of determining liability due to the absence of a viable damages model. It is unclear whether Plaintiffs would have been able to certify a class for damages at a later stage of the litigation, exposing Plaintiffs to a risk of losing class status at a later stage of the litigation. If such status were to be lost, the monetary reward individual Plaintiffs would be entitled to would likely be quite small. The Court noted in its prior order that "it is precisely in circumstances like these, where the injury to any individual consumer is small, but the cumulative injury to consumers as a group is substantial, that the class action mechanism provides one of its most important social benefits. In the absence of a class action, the injury would go unredressed." ECF No. 54 at 7.

---

[5] Nothing in this order should be read as a comment on the ability (or lack of ability) of plaintiffs in other consumer cases to demonstrate classwide damages when the request is supported by an adequate damages model.

12

1   This purpose of the class action mechanism is partially vindicated by the terms of this settlement,
2   which will serve to prevent future consumers from being injured by Defendant's alleged
3   mislabeling.
4       The Court is also persuaded that the extent of discovery completed, the state of the
5   proceedings, and the experience and views of counsel support approval of the settlement. This
6   action was filed in June of 2013. Defendants conducted depositions of Plaintiffs and Plaintiffs
7   obtained documents with information concerning the food labels, advertising, and pricing. As
8   Plaintiffs' note, counsel for both Plaintiffs and Defendant are firms with a significant amount of
9   experience litigating these types of cases. Counsel for both parties advocated for their respective
10  positions vigorously prior to reaching this settlement.
11      No governmental actor is relevant to this action, rendering that factor immaterial to the
12  settlement approval process.
13      The Court will wait until the final approval hearing to determine the reaction of the class
14  members to the settlement. The named Plaintiffs favor approval.
15      Finally, the Court finds the parties' agreement with respect to attorneys' fees and service
16  enhancement awards for named Plaintiffs Lilly and Cox falls "within the range of possible
17  approval." The Court will evaluate the requests for fees and service enhancement awards at the
18  final approval hearing, after Plaintiffs' counsel file their motion for fees and costs, and the class
19  has an opportunity to object.

## IV. NOTICE TO ABSENT CLASS MEMBERS

Finally, Plaintiffs argue that notice to class members is not required because the settlement provides for injunctive relief only and settlement class members will not release any of their monetary claims for the mislabeling. ECF No. 60 at 8. Rule 23(e)(1) states that "[t]he court must direct notice in a reasonable manner to all class members who would be bound by the proposal."

Courts typically require less notice in Rule 23(b)(2) actions, as their outcomes do not truly bind class members. Rule 23(c)(2) provides that "[f]or any class certified under Rule 23(b)(1) or (b)(2), the court *may* direct appropriate notice to the class." Fed. R. Civ. P. 2(c)(2) (emphasis added). Therefore, a Rule 23(b)(2) class is considered "mandatory," as "[t]he Rule provides no

opportunity for (b)(1) or (b)(2) class members to opt out, and does not even oblige the District Court to afford them notice of the action." Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2558 (2011).

The Ninth Circuit does not appear to have directly the addressed the issue of whether class notice is required when a 23(b)(2) action is settled. In Jermyn v. Best Buy Stores, L.P., No. 08 CIV. 214 CM, 2012 WL 2505644, at *12 (S.D.N.Y. June 27, 2012), Judge McMahon of the Southern District of New York approved a class action settlement for injunctive relief and held that class notice was not required. Drawing upon another case from the Southern District, Judge McMahon noted that "the key question in determining whether notice is required is 'whether the rights of absent class members were compromised in any way.'" Id. (citing Selby v. Principal Mut. Life Ins. Co., No. 98 CIV. 5283(RLC), 2003 WL 22772330, at *4 (S.D.N.Y. Nov. 21, 2003)). Because class members retained their right to sue for damages incurred from the challenged practice, but abandoned their ability to sue for alternative injunctive relief for the same challenged practice, the Court concluded that no notice was required.

The Court finds Jermyn's reasoning sound and adopts it here. Because, even if notified of the settlement, the settlement class would not have the right to opt out from the injunctive settlement and the settlement does not release the monetary claims of class members, the Court concludes that class notice is not necessary.

## CONCLUSION

For the foregoing reasons, the Court hereby grants preliminary approval to the parties' class action settlement. The Court will conduct a hearing on May 14, 2015 at 2:00 p.m. to determine whether the Court should grant final approval of the settlement and to determine the appropriateness of Plaintiffs' attorneys' fees and costs and the incentive payments to the Class Representatives.

/ / /

/ / /

/ / /

/ / /

1     Class Counsel shall file their motion for attorneys' fees and costs by no later than April 23,
2  2015.
3     IT IS SO ORDERED.
4  Dated: March 18, 2015



JON S. TIGAR
United States District Judge